UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:05CV-182-R

E.W. DENNISON                                                                    PLAINTIFF

v.

MURRAY STATE UNIVERSITY, et al.                                   DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion for Summary Judgment (Docket #45).

Plaintiff filed a response (Docket #71) to which Defendants have replied (Docket #79) and Plaintiff

filed a sur-reply (Docket #86). Plaintiff has also filed a Motion for Partial Summary Judgment

(Docket #54). Defendants filed a response (Docket #64) to which Plaintiff has replied (Docket #75).

These matters are now ripe for adjudication. For the reasons that follow, Defendants' Motion for

Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and the Plaintiff's Motion

for Partial Summary Judgment is **DENIED**.

## BACKGROUND

On February 12, 1997, Murray State University (MSU), through a letter from University

President, Kern Alexander, offered Plaintiff the position of Director of Athletics (AD) to begin on

March 1, 1997. The offer contained no provision for the duration of the employment. On February

18, 1997, Plaintiff accepted the position. Under established University policy, the initial agreement

and Plaintiff's employment expired on June 30, 1997, the end of MSU's fiscal year. Plaintiff was

re-employed, effective July 1, 1997, by MSU as AD for a one year period. The employment

1

relationship continued on an annual basis by way of similar letters from President Kern Alexander.

Beginning in the summer of 2000, steps were taken to provide Plaintiff with a multi-year contract of employment.  By correspondence dated October 10, 2000, MSU General Counsel John Rall forwarded a contract, titled "Offer of Employment," to Plaintiff for review.  The Offer of Employment indicated that MSU agreed "[t]o employ E.W. Dennison in the position of Athletics Director for the period July 1, 1999 through June 30, 2003 subject to the provisions of [the] contract."  Plaintiff's employment as AD was also subject to the general policies and rules of the University which apply to all employees.

The original draft of the contract had no provision regarding an extension of the term of employment.  Plaintiff requested that the agreement provide for a one year extension for each favorable annual employment evaluation he received from the University President.  The following provision in the form of paragraph D on page two of the contract was added:

> The job performance of E.W. Dennison will be assessed annually by the President, consistent with University policy.  In the event of a favorable evaluation, the term hereof will be extended by one (1) year.  Any such extension must, in order to be binding, be acknowledged in writing by the President and E.W. Dennison.  In no event will the term hereof exceed four (4) years.

Plaintiff accepted the contract and in February 2001 he executed the agreement which was retroactive to July 1, 1999.

During the time that the contract was being prepared, sexual harassment allegations were being made against Plaintiff.  On May 6, 2000, Plaintiff, the Assistant AD for Finance, and Annazette Fields, the Director of the MSU Office of Equal Opportunity, attended a Title IX conference in Indianapolis sponsored by the NCAA.  Fields' husband was the coach of the MSU women's basketball team and Plaintiff's subordinate.  Fields reported that Plaintiff made

2

inappropriate sexual advances towards her while on the trip.  Fields met with Joyce Gordon, MSU's

Associate Vice President for Human Resources, upon returning to Murray.  Plaintiff has denied

these allegations since they were first raised.  Fields decided against invoking the internal

mechanism for resolving complaints of sexual harassment.  Then University President, Dr. Kern

Alexander, confronted Plaintiff about the allegations and reinforced with him MSU's policy

prohibiting sexual harassment.  Fields' duties relating to athletics were re-assigned to Gordon to

prevent future contact between Plaintiff and Field.  Plaintiff was also no longer allowed to have

contact with Fields' husband, who would from then on be supervised by Tom Denton, MSU's Vice

President for Finance and Administration.

By the time the Offer of Employment, which was effective as of July 1, 1999, was executed,

Plaintiff had already received two favorable annual evaluations.  On March 5, 2001, Plaintiff sent

a facsimile message to MSU's General Counsel.  He attached his annual evaluations and a copy of

the Offer of Employment and asked, "In your opinion, do the attached evaluations fulfill the

requirements needed to satisfy paragraph D page 2 for an extension of my personal [sic] contract."

Rall responded via email later that day, stating in pertinent part:

> i have reviewed the materials.  The extension must be acknowledged in writing in
> order to be binding.  i think the evaluations may provide the basis for your requesting
> dr. alexander for an extension, but i do not believe they satisy [sic] the contract
> language since they do not acknowledge the extension.  please call if you have any
> questions.

Plaintiff responded via email:

> I agree with you, I don't think the favorable evaluations are enough to extend the
> contract.  I intend to visit with [Dr. Alexander] ASAP to discuss a solution.  Since
> the document originated in your office, could you prepare a suitable addendum that
> will address the issue that I can purpose [sic] to him.  I believe he will have no
> problem with the extension or a new contract, but I know he will want a remedy that
> will satisfy your office.  Thanks E.W.

3

An amendment to Plaintiff's contract was executed by Plaintiff and MSU's President on March 28, 2001.  The two "specifically acknowledged that the term of the contract is extended" as a result of the evaluations.  The amendment extended the term of the Offer of Employment for two years so that the term of Plaintiff's employment expired June 30, 2005.

On July 5, 2002, Plaintiff posed the same question to Rall when he sent the Offer of Employment and the amendment to the General Counsel.  Rall responded the same day via e-mail, stating:

> I have reviewed the materials faxed.  Paragraph I (D) of the original agreement provides that the one year extension, based upon a favorable evaluation, must be acknowledged in writing by you and the President.  Since the acknowledgment must be in writing, I probably would just do another "amendment" like the one done last year, and do that every year that there is a favorable evaluation.

President Alexander failed to conduct an annual evaluation of Plaintiff for 2002.

On September 27, 2002, the MSU Board of Regents, the University's governing board, met for a regular meeting.  Plaintiff was requested to present a "state of the union" on MSU Athletics.  Plaintiff talked about the increased graduation rate of black athletes and other positives in the Athletics Program.  Thereafter the Board went into closed session and questioned him in detail about the Athletics Program.  Plaintiff was specifically asked about declining summer camp enrollment, the head football coach's missing a speaking engagement, reports that the football coach had bought a drink for a student athlete and was having an affair on campus, the soccer coach's wife's verbal abuse of student athletes, telephone calls from parents that coaches had promised their daughters and sons in sororities and fraternities that if they would come to athletic events there would be kegs of beer there, and the failure to recruit more local athletes.  Plaintiff was basically told to correct the situation.  Plaintiff assured the Board that corrective action would occur.

The problems in Athletics persisted over the next two years.  Two football players were found to have stolen from dormitory rooms, a third football player attempted to steal from a dormitory room, two men's basketball players were arrested for the possession of marijuana, a member of the women's volleyball team falsely represented her playing experience prior to enrolling at MSU resulting in MSU's forfeiture of all of its conference games, and the football coach was found to have committed a secondary violation of NCAA rules in his efforts to recruit a player.  In March of 2004, the MSU men's basketball team qualified for the NCAA men's basketball tournament.  On March 6, a player on the team was arrested for DUI.  Two other players were arrested for possession of marijuana, possession of drug paraphernalia, and other offenses just days before MSU's nationally televised game with the University of Illinois.  These arrests were widely reported in local and national media, causing great embarrassment to MSU during a time when peer institutions were completing questionnaires about MSU for U.S. News and World Report.  Graduation rates were also declining.  The 2004 NCAA report on graduation rates for student athletes enrolling in 1997-1998 and who received athletically based financial aid their freshmen year indicated that male athletes graduated at the rate of 38%.[1]  For the four preceding years beginning with 2000 the rates had been 52%, 43%, 57% and 42%.

The Murray State University Athletics Foundation, Inc. was incorporated on July 10, 1997.  This organization, operating under the name of the "Racer Foundation," is a not for profit entity organized, according to its articles of incorporation, to "aid, strengthen, and expand the educational purposes of Murray State University with particular emphasis on assistance to Murray State University's intercollegiate athletic program."   MSU took steps at the time of the Racer

---

[1]  1997-1998 was Plaintiff's first full year as AD.

Foundation's formation to ensure that their relationship with the Racer Foundation was compliant with the NCAA principle regarding "Institutional Control."[2]

As an initial step to ensure MSU representation with the Racer Foundation, the AD was made an ex officio member of its Board of Directions and the Assistant AD for Marketing and Promotion was made its Executive Director. The Racer Foundation and MSU also entered into an agreement under which the Racer Foundation assumed responsibility for marketing advertising and parking at athletics venues. The agreement specifically provided that it would terminate in the event it was deemed violative of any rule, regulation, or legislation of the NCAA.

MSU hired a new President, Dr. F. King Alexander (Alexander), in the Fall of 2001. Shortly

---

[2]      The principle of Institutional Control is found in Article 6 of the NCAA Constitution, which states:

6.01 GENERAL PRINCIPLES

6.01.1 Institutional Control. The control and responsibility for the conduct of intercollegiate athletics shall be exercised by the institution itself and by the conference(s), if any, of which it is a member. Administrative control or faculty control, or a combination of the two, shall constitute institutional control.

6.1 INSTITUTIONAL GOVERNANCE

6.1.1 Chief Executive Officer. A member institution's chief executive officer has ultimate responsibility and final authority for the conduct of the intercollegiate athletics program and the actions of any board in control of that program.

6.4 RESPONSIBILITY FOR ACTIONS OF OUTSIDE ENTITIES

6.4.2 Independent Agencies or Organizations. An institution's "responsibility" for the conduct of its intercollegiate athletics program shall include responsibility for the acts of an independent agency, corporate entity (e.g., apparel or equipment manufacturer) or other organization when a member of the institution's executive or athletic administration, or an athletics department staff member, has knowledge that such agency, corporate entity or other agency is promoting the institution's intercollegiate athletics program.

after he arrived, Alexander expressed concerns to Plaintiff that a small group of people were running the Racer Foundation and over the propriety of the marketing agreements.  He also raised questions as to whether the Racer Foundation was following proper procedure with respect to certain expenditures.  The Racer Foundation in turn questioned perceived actions by Alexander de-emphasizing Athletics.  Plaintiff believed that Alexander was also de-emphasizing the sports of baseball, football, and men's basketball by providing them with less financial support.  Plaintiff also disagreed with the Alexander's plan to disband scholarship football and to finance a greater portion of Athletics from private, as opposed to public, sources.

The Racer Foundation was governed by an Executive Committee, consisting of a few members, which met monthly and a full Board of Directors which met twice a year.  The Executive Committee planned its meetings to be held on Thursdays, but these meetings were often changed. Alexander was frequently unable to attend these meetings because of scheduling conflicts. However, he would transmit concerns to the Executive Committee via the AD.

Plaintiff indicated that the differences between the Racer Foundation and Alexander would be alleviated if Alexander would meet with the Foundation.  Alexander specifically informed Plaintiff that he wanted to be present at the full Board of Directors meeting to be held in the summer of 2003.  Certain members of the Executive Committee told Plaintiff that they did not want Alexander there due to recent disagreements.  Plaintiff advised Alexander the day after the meeting took place that he was not invited to it.

Plaintiff received a negative employment evaluation for the school year 2003-2004 and,

7

consequently, was given no raise for fiscal year 2004-2005.[3]  The evaluation stated that "numerous incidents occurred that have negatively impacted the reputation of the entire University," and that Alexander had to "allocate an inordinate amount of time to rectifying the multitude of concerns that emerged throughout the year."  Alexander concluded the evaluation by stating, "Therefore, I must express my deep dissatisfaction with the overall management and performance of our Director of Athletics E.W. Dennison during the 2003-2004 academic year."

Problems in Athletics continued after the evaluation.  In July, the University had to disassociate itself with an assistant men's basketball coach who was soon to be indicted for Federal Pell Grant fraud allegedly committed while at another school so that the coach would not be on MSU staff when he was indicted.  The assistant coach had been hired without an employment search based on Plaintiff's advice.

Although there were negative aspects, there were also positive aspects to the Athletics Program.  Women athletes graduated at the rate of 86% in 2004, and the graduation rate of MSU student athletes typically exceeded that of other public universities in Kentucky.  MSU received recognition for increasing its athletics participation rates for women.

In November of 2001, Plaintiff and his wife, who are Republicans, hosted a political fund-raising event for incumbent U.S. Congressman Ed Whitfield.  At the time, Alexander's brother was a Democratic contender for Whitfield's seat.  Plaintiff spoke with Alexander about the fund-raiser and was assured that "it was okay" and "Oh that's not really a problem."  Plaintiff asserts that his hosting of this fund-raiser resulted in the deterioration of his relationship with Alexander.

---

[3]  Alexander had recommended Plaintiff for salary raises for the academic years 2002-2003 and 2003-2004.

In the summer of 2004, Alexander began to take steps to redefine MSU's relationship with the Racer Foundation. In a letter to the Chairman of the Racer Foundation, Alexander suggested that revenues from parking, signage, ticket sales, and advertising, which were going to the Racer Foundation pursuant to the marketing agreement, flow instead to MSU. The letter expressed Alexander's concerns for Institutional Control.

As a result of the changes in the relationship between MSU and the Racer Foundation, funds donated to Athletics no longer go the Racer Foundation. A new Racer Club was formed which is operated totally by the Athletics Department. The marketing agreements were also mutually rescinded.

Alexander stated that he realized by September 2004, that he could no longer work with Plaintiff to correct the problems in the Athletics Department. Alexander decided to transfer Plaintiff from his position as AD.

Alexander met with Jim Carter, Vice President of University Development, to gather ideas about transferring Plaintiff to a position in the Development area. As a result of these discussions, it was agreed that Plaintiff would become the Director of Corporate and Foundation Giving (DCFG). The creation of this position had been under consideration for at least a year.

At the next regular meeting of the Board of Regents on September 17, 2004, Alexander told the Board that the Plaintiff was being transferred to the position of DCFG. Alexander advised the Board that the transfer would not entail a loss of salary or benefits. During this closed session meeting, Alexander outlined issues occurring in Athletics for the previous two years. On January 1, 2005, the Board of Regents unanimously approved the University salary roster as of January 1, 2005, which included Plaintiff as DCFG.

9

During the closed session meeting of the Board of Regents on September 17, 2004, Alexander informed the Board that he had been in contact with the NCAA and that representatives from that organization were going to conduct a cultural review of the Athletics Department.  That review was conducted by two representatives of the NCAA, Ron Stratten and Rosie Stallman, on November 16th and 17th of 2004.  The eight page report from the NCAA made a variety of recommendations for improving the Athletics Department.

Plaintiff was advised of the transfer in a conference with various University administrators held immediately after the Board of Regents meeting adjourned.  He was provided with a copy of the job description for the new position.  Plaintiff asserts that he did not want to accept the DCFG position but felt he had no choice.  Plaintiff states that at the time he was removed from the AD position, Alexander threatened to go to the press with his list of problems in athletics and the EO sexual harassment allegations raised by Annazette Fields if Plaintiff did not cooperate.

Plaintiff reported to his new position on September 20, 2004.  After the transfer, Plaintiff's annual salary from MSU was $111,816, an increase from his annual salary as AD.  As AD, Plaintiff was allowed to earn $10,000 from the Racer Foundation for his work for that organization.  Plaintiff had also previously received a $500 per month automobile allowance from the Racer Foundation. Because Plaintiff was no longer able to receive payments from the Racer Foundation, MSU assumed responsibility for these amounts.  Plaintiff's total salary and benefits as DCFG had an annual value in excess of $155,000.  Additionally, Plaintiff continued to take advantage of tuition waivers for his daughter while he was DCFG.

As DCFG, Plaintiff was initially asked to focus on the Paris/Henry County, Tennessee area. Plaintiff had stated that he knew various people, including the vice mayor in that area.  Although

10

opportunities were provided to attend conferences in order to acquire enhanced fund-raising skills, Plaintiff did not take advantage of them.

While serving as DCFG, a search was conducted of Plaintiff's University work computer under the instructions of his supervisors.  A ten page draft press release dated November 29, 2004, was discovered which announced Plaintiff's resignation and was filled with personal grievances against Alexander.  During the same time, in January of 2005, Alexander directed an audit of the AD office.

By letter dated February 1, 2005, Plaintiff resigned from his position, effective that day. Plaintiff indicated that he believed "it is in my best interest to resign from my position as [DCFG] to continue my career in my chosen field of athletic administration."

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact

could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).  Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

## I.    BREACH OF CONTRACT

### A.    *Breach*

Plaintiff claims that his removal as AD and transfer to the position of DCFG prior to the expiration of the term of his contract was in breach of his employment contract.  Plaintiff seeks recovery, in Counts I and II of his Complaint and Amended Complaint for the alleged breach of contract under both statutory and common law.  However, as Plaintiff's employment was with a public university, his claim can only be pursued pursuant to KRS 45A.245(1) which provides a limited waiver of immunity for written contract claims against the Commonwealth of Kentucky.  *Commonwealth v. Whitworth*, 74 S.W.3d 695, 699 (Ky. 2002).  The parties have filed cross-motions for summary judgment on the breach of contract claim.

The parties agree that the standard with regard to a court's consideration of a breach of

contract claim is correctly stated in *Green v. McGrath*:

> [W]hen two intelligent parties have read the contract before signing it, and one thereafter says it meant something different, or was subject to some unexpressed condition, reservation, limitation, provision, or understanding, but the other says it meant just what said, no more and no less, it is our opinion that stability and a salutary confidence in the written word requires the instrument itself to prevail.

> "Under the guise of interpretation, courts are repeatedly importune to give a meaning to the writing under consideration which is not to be found in the instrument itself, but which is based entirely on direct evidence of intention. And just as steadfastly the courts [this court, at least] reiterate the well established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make."

*Green v. McGrath*, 662 F. Supp. 337, 342 (E.D. Ky. 1986) (quoting *O. P. Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968) (quoting *Williston on Contracts*, Third Edition, Section 610A (Vol. 4, p. 513))), *aff'd*, 818 F.2d 866 (6th Cir. 1987). Therefore, the fact that one party to the contract may have intended a different result is "insufficient to alter the plain and unambiguous terms of a written contract." *Id*.

The pertinent parts of Plaintiff's contract state:

> WHEREAS, Murray State University is committed to the notion of rewarding success and providing job security so as to enable the Athletics Director to foster the continued improvement of the athletics department; and

> WHEREAS, Murray State University is desirous of employing E.W. Dennison as Athletics Director in accordance with the terms herein;

I.    MURRAY STATE UNIVERSITY AGREES;

A.    To employ E.W. Dennison in the position of Athletics Director for the period July 1, 1999 through June 30, 2003, subject to the provisions of this contract.

C.    To assign job responsibilities for the period commencing July 1, 1999 through June 30, 2003 consistent with the duties of Athletics Director, subject to the provisions of this contract.

II.   E.W. DENNISON AGREES:

13

A.     To fulfill the duties of Athletics Director pursuant to the terms of this contract at Murray State University

III.    IT IS MUTUALLY UNDERSTOOD AND AGREED:

E.     That this contract is subject to all applicable statutes and decisional law, and to all rules, policies, and regulations of University and may be terminated at any time in accordance therewith without further compensation and other rights and benefits under this agreement and University personnel policies.

Plaintiff argues that these provisions in the employment contract indicate that he was entitled to continue employment in the specific position of AD, while Defendants argue that the Board of Regents' transfer policy and Plaintiff's employment contract allowed MSU to transfer Plaintiff from the position of AD to the position of DCFG.

Pursuant to MSU policy, Plaintiff was considered a regular staff employee.[4]  The Board of Regents' transfer policy applies to staff and allows MSU to transfer employees from one position to another at the same pay grade level or a similar salary.

Although Plaintiff's employment contract stated that he would be employed in "the position of Athletics Director" and that MSU would assign Plaintiff job responsibilities "consistent with the duties of Athletics Director," these provisions were subject to MSU policies, including the MSU

---

[4]  The Job Description for the AD position was listed under Staff positions.

The MSU Policy states in relevant part:

The following categories are used to define employee status of all University staff employees. Definitions may be altered or may not be applicable due to contractual agreements with other entities:

1. Regular Staff Employees

a. No regular staff employee shall have an employment contract right beyond June 30 of the fiscal year in which that employee is hired SAVE AND EXCEPT as the term may be longer than one (1) year, but in no event longer than four (4) years.

14

transfer policy.

Plaintiff points to *Board of Regents of Kentucky State University v. Gale*, to support his position that the employment contract was breached when he was transferred to the DCFG position. That case involved the interpretation of an Offer of Employment made by Kentucky State University to Dr. Steven H. Gale for a professorship "occupying the University's Endowed Chair in the Humanities," with "tenure upon appointment." *Bd. of Regents of Ky. State Univ. v. Gale*, 898 S.W.2d 517, 520-21 (Ky. Ct. App. 1995). In an attempt to limit the duration of Gale's employment, the University argued that the contract only gave Gale the "opportunity to 'occupy' the Endowed Chair" rather than tenure in the Chair. *Id.* The Court held that Gale was entitled to tenure stating, "Gale was not offered just any professorship at KSU; he was offered the only professorship 'occupying the University's Endowed Chair in the Humanities." *Id.* at 521. Relying on the plain language of the contract, the Court stated, "we can find nothing in the plain words of the contract that remotely suggests that Gale was hired to serve in any capacity other than the holder/occupant of the Endowed Chair." *Id.*

Plaintiff claims that like Gale, he was not offered any position at MSU, he was offered the AD position and therefore requiring him to serve in any position other than AD was a breach of his contract. This Court finds *Gale* distinguishable from the present case. In the contract at issue in *Gale*, unlike that in the present case, there was no provision providing that the contract was subject to all University policies, one of which is a transfer policy. This Court finds that the incorporation of this policy into the contract allowed MSU to transfer the Plaintiff to the DCFG position. *Cf. Royster v. Bd. of Trs.*, 774 F.2d 618, 621 (4th Cir. 1985) ("Indeed, to hold that Royster had a constitutionally protected property interest in continuing to perform his services would make it

15

impossible for a public employer, dissatisfied with an employee's performance, but without specific contractual clause to discharge him, to relieve the employee from his duties although willing to compensate the employee in full.").

Therefore, this Court finds that Plaintiff's claim of breach of contract fails as a matter of law.


## II.    FREEDOM OF SPEECH AND EXPRESSION

Plaintiff contends that his transfer was in retaliation for his political beliefs.  His Amended Complaint seeks monetary damages and names as defendants MSU, the Board of Regents of MSU, and Alexander in their official capacities, and Alexander in his individual capacity.  The claim is brought pursuant to 42 U.S.C. § 1983 and Article 1 of the Kentucky Constitution.

Plaintiff now admits that he can assert this cause of action only against Alexander individually; therefore the claims against MSU, the Board of Regents of MSU, and Alexander in his official capacity should be dismissed.

The Kentucky Constitution provides protection no greater than, but only co-extensive with the First Amendment to the United States Constitution.  *McDonald v. Ethics Comm. of the State Judiciary*, 3 S.W.3d 740, 743 (Ky. 1999).  Therefore, this Court will analyze this matter under federal principles.     To prevail in a First Amendment retaliation claim, the plaintiff must prove the following elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.  *Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000).  If the Plaintiff meets his burden, the burden then shifts to the Defendant to prove by a preponderance of the evidence that the

16

employment decision would have been the same absent the protected conduct.  *Id.*

Plaintiff claims that his relationship with Alexander went downhill after he hosted a fund-raising event for Congressman Ed Whitfield, Alexander's brother's opponent for Congress, on November 10, 2001.  Defendant indicates that for the purposes of this motion, the Court should assume that this activity was protected.[5]

Plaintiff claims that after holding the fund-raiser, his communication with Alexander broke down and that Alexander would cuss and yell at him.  Plaintiff indicates that he changed his conduct to be less active in the Republican party by not hosting fund-raisers or attending political outings due to the problems with Alexander.  Plaintiff claims that he was ultimately removed from his position as AD due to his political activity.

Plaintiff must demonstrate that his transfer to the position of DCFG and that his breakdown in communication with Alexander were adverse employment actions.  An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Freeman v. Potter*, 2006 U.S. App. LEXIS 25072, *7-8 (6th Cir. 2006) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  In making this determination, the court does not look to Plaintiff's subjective impression of the desirability of one position over another, rather the court

---

[5]  Plaintiff also indicates that Alexander did not allow Whitfield access to the MSU football field during the campaign and that he criticized the Racer Foundation Board for being "too Republican."

17

looks at whether a particular employment action was objectively intolerable to a reasonable person. *Freeman v. Potter*, 2006 U.S. App. LEXIS 25072 at *9 (citing *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002)).  "In short, the action must have a 'significant detrimental effect' on the employee's status as evidenced by objective factors, not subjective impressions."  *Id.* at *10 (citing *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999)).

In general, a lateral transfer is not a materially adverse action.  *Id.* at *11.  However, due to the fact-specific nature of the inquiry, there are a number of cases that have concluded that a transfer did not constitute an adverse employment action, and a number that have found such employer action adverse.  *See id.* *11 n.2 (listing pertinent cases).

Here Plaintiff clams that his reassignment as DCFG involved significantly different responsibilities than he had in his position as AD.  Plaintiff indicates that he was transferred from a position where he was responsible for a six million dollar budget and fifty employees to no budget and the assistance of a part-time student worker.  In his position as DCFG, Plaintiff no longer reported directly to the President, rather he reported to an individual who reported to another individual who reported to the President.  Plaintiff was also moved from a large office capable of holding meetings to a small office that could hold a maximum of three people and was equipped with an antiquated phone.  Plaintiff also complains that he was hindered in this position as he was initially limited to fund-raising efforts in only one county in Tennessee and by negative press releases by MSU.

The decrease in the size of Plaintiff's office and the provision of an "antiquated" telephone do not constitute a material adverse employment action.  *See Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004) (finding that reduction in plaintiff's lab space, from 2000 to 150 square feet,

18

was not a materially adverse employment action as it did not have a material adverse effect on salary or status of employment although it likely had an initial effect on plaintiff's ability to conduct research).  This Court also finds that the breakdown in communication between Plaintiff and Alexander, and any cussing or yelling as a result thereof, does not constitute a material adverse employment action as it did not have a significant detrimental effect on Plaintiff's status.  *See Freeman*, 2006 U.S. App. LEXIS 25072 at *10 (citing *Boone*, 178 F.3d at 256).  However, this Court finds that the decrease in the budget between the positions, from six million dollars to none, and the decrease in the number of employees which Plaintiff supervised, from fifty to one part-time student worker, entails an adverse employment action.  *See Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir. 1997) (finding adverse employment action where plaintiff transferred to position lacking supervisory status, had fewer opportunities for salary increases, and offered little opportunity for advancement), *cited in Freeman*, 2006 U.S. App. LEXIS 25072 at *11 n.2 ; *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 412 (3d Cir. 1999) (finding adverse employment action where teacher transferred to a "difficult school" teaching "less desirable science classes" than before and was passed over for a promotion), *cited in Freeman*, 2006 U.S. App. LEXIS 25072 at *11 n.2; *cf. Freeman*, 2006 U.S. App. LEXIS 25072 at *14 (finding no adverse employment action where plaintiff was refused transfer to head of an office with responsibility for its budgets and plans when in his current employment he supervised forty-nine employees and various special event programs and educational tours).

Plaintiff must demonstrate that this adverse employment action was casually connected to the fund-raising event Plaintiff threw for Whitfield.  *See Soward*, 203 F.3d at 431.  As there is no direct evidence of a causal connection, Plaintiff must rely on circumstantial evidence.  Defendants

claim that the length of time in between the fund-raising event, held on November 10, 2001, and the transfer, occurring in September of 2004, was too long to give rise to any inference that the transfer was for improper reasons.

Several courts have held that a significant gap in time between the protected activity and the adverse action cannot give rise to an inference of retaliatory motive. *See Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 344 (6th Cir. 2001) (finding no genuine issue of material fact as to causal connection where protected activity occurred three years before the alleged adverse action); *Candelaria v. E G & G Energy Measurements*, 33 F.3d 1259, 1261 (10th Cir. 1994) ("No such inference [of a retaliatory motive] can be made where the relevant charges preceded the employer's adverse action by as much as three years"); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110-111 (1st Cir. 1988) (holding that discharge over two and one half years after employee filed EEOC complaint was insufficient showing of retaliation for employer to avoid summary judgment). Plaintiff indicates that although there was a significant gap in time between the fund-raiser and the transfer, the transfer was part of a continuing violation and therefore was causally connected to the protected activity. Plaintiff asserts that this violation began with the breakdown in communication which included yelling and cussing. As discussed above, this Court has found that this breakdown in communication was not a material adverse action; thus, Plaintiff cannot assert a continuing violation. This Court finds that the period in between the protected conduct and the alleged adverse action was too lengthy to give rise to an inference of retaliatory motive and, therefore, Plaintiff can not show that the protected action and the adverse employment action were causally connected.

The Court also finds that even if Plaintiff had established a prima facie case of retaliation, the Defendant would have been able to prove that the employment decision would have been the

20

same absent the protected conduct.  *See Sowards*, 203 F.3d at 431.  The Board of Regents, of which eight members are appointed by the Governor to  reflect the proportional representation of the two leading political parties of the Commonwealth based on voter registration, *see* KRS 164.321(3), ratified, by unanimous vote, Alexander's transfer of Plaintiff in February 2005, when it approved MSU's roster of employees as of January 1, 2005, showing Plaintiff as DCFG. Plaintiff has made no contention that any member of the Board of Regents at the time of transfer was influenced by a political motive.

Therefore, this Court finds that Plaintiff's claim under 42 U.S.C. § 1983 and Article I of the Kentucky Constitution fails as a matter of law.  Additionally, this Court finds that even if Plaintiff was able to make a prima facie showing, Defendant would be entitled to summary judgment as he could show by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.

## III.   DEFAMATION

Plaintiff asserts this claim against Alexander only, alleging that Alexander disseminated false information concerning Plaintiff.  The elements of defamation in Kentucky are: (1) defamatory language; (2) about the plaintiff; (3) which is published; and (4) which causes injury to reputation. *Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273 (Ky. Ct. App. 1981).  In Kentucky truth is a complete defense, thus a defendant able to prove the truth of the statement at issue cannot be held liable for defamation.  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795-96 (Ky. 2004). Public figures are prohibited from recovering damages for defamatory falsehoods relating to official conduct unless they can prove that the statement was made with actual malice, that is, with the

21

knowledge that it was false or with reckless disregard of whether it was false or not.[6] *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 14-15 (1990). This showing of malice is subject to a clear and convincing standard of proof. *Id.* at 15

Kentucky courts have held that language is defamatory for purposes of the first element of this test "if it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or (3) injure him in his business or occupation." *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981).

Defendant claims that the statements were made within an employment relationship, and thus entitled to qualified privilege under Kentucky defamation law. In *Columbia Sussex Corp., Inc. v. Hay*, the Kentucky Court of Appeals found that privilege existed to cover statements made in the context of an investigation of a hotel robbery in which the plaintiff was suspected to have been complicit. *Columbia Sussex*, 627 S.W.2d at 275. In so holding, the court said:

> A robbery had occurred at [the employers'] place of business, which robbery carried certain indicia of having been an inside job. It was not, therefore, unexpected for [the employers] to have engaged in their own investigation, bounded by the standard of reasonableness. The privilege which thus existed was not an absolute one, such as judicial immunity, but rather one qualified by the proviso that it not be abused, *i.e.* that whatever defamation may have been spoken related solely to the investigation, that the remarks not be over-publicized, and that they not be published with malice.

*Id.* (citing *Baker v. Clark*, 218 S.W. 280 (Ky. 1920)). The *Columbia Sussex* court also noted that "[t]he determination of the existence of privilege is a matter of law." *Id.* at 276 (citing *Caslin v. Gen. Elec. Co.*, 608 S.W.2d 69 (Ky. Ct. App. 1980)).

Alexander relies on *Rich v. Kentucky Country Day, Inc.* to assert that Plaintiff was required to allege specific damages resulting from the statements made "other than just mental pain,

---

[6] Defendant, AD at a large university, does not dispute that he was a public figure.

22

humiliation, disgrace or mortification" in his Complaint.  In *Rich v. Kentucky Country Day*, the Kentucky Court of Appeals held that in a defamation action based upon slander per quod, the plaintiff must, in his Complaint, allege facts which would show specific damages and if plaintiff's prayer is for general damages only, the Complaint does not state a cause of action for slander per quod.  *Rich v. Ky. Country Day, Inc.*, 793 S.W.2d 832, 837 (Ky. Ct. App. 1990).  Although Plaintiff has failed to allege special damages, his claim is not for slander per quod, it is for libel per se.  The statements at issue here were not oral statements, rather they were written and printed communications.  "[W]ritten or printed publications, which are false and tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame are libelous per se."  *Stringer*, 151 S.W.3d at 795 (quoting *Courier-Journal Co. v. Noble*, 65 S.W.2d 703, 703 (Ky. 1933)).  Plaintiff has alleged that Alexander's statements "resulted, and continue to result, in injury to the reputation of the Plaintiff," thus, Plaintiff's claim is for libel per se rather than libel per quod and, therefore, he need not allege special damages.

1.    "Statement of Particulars"

Plaintiff bases his claim of defamation in part on a document prepared by Alexander entitled "Statement of Particulars Regarding Problems with the Murray State University Department of Athletics."  The Statement of Particulars contains forty separate statements regarding the MSU Department of Athletics.  Alexander gave this document to some of the members of the Board of Regents prior to Plaintiff's removal and then to each of the members of the Board of Regents during the September 17, 2004, meeting where Alexander officially informed them of Plaintiff's removal from the AD position.  Plaintiff does not assert that all of the statements contained in the Statement of Particulars are false, he only challenges the veracity of statements number 7, 10, 12, 13, 20, 27,

23

33, 36, and 38.

A.      Statements 7, 13, 33, and 36

Defendant argues that Plaintiff cannot show that statements 7, 13, 33, or 36 are about the

Plaintiff and therefore are not defamatory to him. "When the defamatory statement does not name

the defamed person, that person must prove that the article refers to himself." *E.W. Scripps Co. v.*

*Cholmondelay*, 569 S.W.2d 700, 702 (Ky. Ct. App. 1978). "The plaintiff need not be specifically

identified in the defamatory matter itself so long as it was so reasonably understood by plaintiffs

friends and acquaintances . . . familiar with the incident." *Stringer*, 151 S.W.3d at 793-94 (internal

quotation omitted).

The disputed portion of Statement 7, reads:

February 2003: I specifically request to the Director of Athletics, as an Ex Officio
member of the Racer Foundation, that the RACER Foundation hold a scheduled
meeting after two years of secret and infrequent meetings.

I also wanted to express concerns about the following practices of the RACER
Foundation:

☐      Lack of openness and transparency of decision-making processes.

Although this statement does reference Alexander's request to Plaintiff as an ex officio

member of the Racer Foundation that the Foundation hold a scheduled meeting, it does not indicate

that Plaintiff was responsible or involved in the alleged lack of openness and transparency of

decision-making processes practiced by the Racer Foundation.[7] As Plaintiff only participates on the

Racer Foundation's Board of Directors in an advisory capacity, Plaintiff's friends and acquaintances

_____

[7] Plaintiff does not dispute Alexander's statement that he requested to the Plaintiff that
the Racer Foundation hold a scheduled meeting.  Plaintiff does dispute Alexander's assertion
that there were secret meetings to which he was not invited.

24

would not reasonably understand the statement's concerns over the lack of openness and transparency of decision-making processes as being about the Plaintiff. *See id*.

The disputed portion of Statement 13, reads:

After these recommendations were made to the Director of Athletics action by the RACER Athletics Foundation Executive Committee to broaden participation and involvement was delayed and even resisted by members of the Executive Committee and the Director.

Although the statement references the Racer Foundation Executive Committee, it also claims that Plaintiff delayed and even resisted actions to broaden participation and involvement of the Racer Foundation. Therefore, this Court finds that Plaintiff has shown that this statement is about the Plaintiff. However, Alexander has shown that this statement was not false. Plaintiff admits that the recommendations were resisted, however, he asserts that they were not delayed. In his deposition, Plaintiff indicates that the recommendations were implemented a few months after they were made. This Court finds that the implementation of the recommendations a few months after they were made constitutes a delay. Therefore, this Court finds that the statement is not false and therefore is not actionable.

Statement 33 reads:

June 18, 2004. MSU Board of Regents discusses issue of "Institutional Control" with regard to the RACER Foundation because of increasing concerns over revenue declines, SACS accreditation, institutional control which is controlled by the NCAA (the NCAA does not need to identify specific charges and violations to investigate university athletic programs. They only need to suspect that there is a lack of "institutional control."

Nowhere in this statement does Alexander reference the Plaintiff, nor has Plaintiff demonstrated that the article refers to himself. Although Plaintiff is an ex officio member of the Board of Directors, he participates in an advisory capacity only. This Court finds that Plaintiff's

25

friends and acquaintances would not reasonably understand the statement as referring to Plaintiff. *See id.*

> Statement 36 reads:
>
> September 1, 2004: The athletic director indicated to me that if we move to acquire greater institutional control regarding concerns in the RACER Foundation that there would be dire consequences in the community

Although the statement references the Racer Foundation, it also claims that Plaintiff warned Alexander that an attempt to acquire greater institutional control would result in dire consequences. Therefore, this Court finds that Plaintiff has shown that this statement is about the Plaintiff. However, Alexander has shown that this statement was not false. In an email from Plaintiff to Alexander dated September 1, 2004, Plaintiff discusses Alexander's proposed structural change to the Racer Foundation. Plaintiff states in reference to agency contracts relating to advertising revenues, "These are good guys who donate their time and money to help not only athletics but our university as well as this community. I believe this could be a potential bombshell if these guarantees are not granted." Thus, this Court finds that the statement is not false and therefore is not actionable.

Therefore, this Court finds that Plaintiff's claims that Statements 7 and 33 are defamatory fail as a matter of law as these statements are not about the Plaintiff. *See Columbia Sussex*, 627 S.W.2d at 273. Although Statements number 13 and 36 are about the Plaintiff, Alexander has shown that the statements were true and therefore Plaintiff's claim that these statements are defamatory fails as a matter of law. *See id.* at 705-95.

B.      Statements 20, 27, and 38

Alexander argues that Plaintiff cannot show that statements 20, 27, and 38 are about the

26

Plaintiff and therefore are not defamatory to him.  Alexander asserts that "Attendance and revenue figures embody a number of factors - the popularity of a particular coach or player, the success of a team, the strength of opponents, the disposable income in the community - but are not 'of and concerning' the Plaintiff."

The disputed portion of Statement 20 reads:

November 30, 2003: Internal reports indicate that MSU football attendance continued to decline.

Nowhere in this statement is Plaintiff specifically mentioned.  Plaintiff's friends and acquaintances would not reasonably understand the statement, indicating that football attendance was declining, as being about the Plaintiff as the decline could be a result of a myriad of factors. *See id.* at 793-94.  Additionally, Alexander has demonstrated that this statement was not false. NCAA documents indicate that MSU ranked 45th in I-AA football home attendance in 1998, having a total attendance of 45,852 and an average attendance of 9170.  NCAA statistics from 2003 show that MSU's total football attendance was 24,194 and that average attendance was 4032. In 2003, MSU ranked 89th in I-AA football home attendance.  Therefore, this Court finds that the statement is neither false nor about the Plaintiff and therefore is not actionable.

Statement 27 reads:

April 2004.  2003-2004 average attendance for men's basketball remains virtually unchanged when compared to previous year despite having a 28-6 final record and a new coach

Nowhere in this statement is Plaintiff specifically mentioned.  Plaintiff's friends and acquaintances would not reasonably understand the statement, indicating that men's basketball attendance was virtually unchanged, as being about the Plaintiff.  *See id*.  The decline could be the result of a number of factors although the statement appears to rule out the player's performance and

27

the coach as contributing ones.  NCAA documents indicate that total attendance at MSU basketball games was 67,328  for the 2004 season with an average game attendance of 4208.  For the 2003 season total attendance was 56,316 with an average game attendance of 4023.  Thus, in 2004, average game attendance increased by 185 and total season attendance increased by 11,012.  This Court finds that there is a question of fact as to whether these figures represent an increase or demonstrate that attendance was virtually unchanged.  However, although this Court finds that there is a material question of fact as to whether the statement was false, the statement is not actionable as it is not about the Plaintiff.

Statement 38 reads:

September 2004.  MSU football attendance and revenue projections indicate a significant decline from previous season.

Nowhere in this statement is Plaintiff specifically mentioned.  Plaintiff's friends and acquaintances would not reasonably understand the statement, indicating that football attendance was declining, as being about the Plaintiff as the projected decline could be a result of a myriad of factors.  *See id*.  Plaintiff has produced evidence disputing the accuracy of these projections.  However, although this Court finds that there is a material question of fact as to the accuracy of the projections, the statement is not actionable as it is not about the Plaintiff

Therefore, this Court finds that Plaintiff's claims that Statements 20, 27, and 38 are defamatory fails as a matter of law as these statements are not about the Plaintiff.  *See Columbia Sussex*, 627 S.W.2d at 273.

C.      Statement Number 10

Statement 10 reads:

May 2003: Director of Athletics schedules an urgent meeting with me to inform me

28

that the RACER Athletic Foundation had met on the previous day and that he deliberately did not include me because he did not think it was a good idea. During our discussion the Director of Athletics informed me that he would rather "beg for forgiveness" than to have included me in the meeting as I had insisted that he do on numerous occasions

Plaintiff admits that he informed Alexander in May 2003, that the Racer Foundation had met on the previous day and that Alexander had not been invited to the meeting. Plaintiff asserts that he never said that he would rather "beg for forgiveness" than include Alexander in the meeting. Plaintiff also asserts that he had recommended that the Racer Foundation include Alexander in this meeting. Thus, this Court finds that there is a material factual dispute as to the veracity of this statement. Drawing all reasonable inferences against Alexander, this Court finds that Defendant has failed to show that the statement was not made with actual malice, as Alexander would know the contents of a purported quote made to him. This statement is also defamatory as it indicates that Plaintiff deliberately excluded his superior from a meeting which he specifically asked to attend. Such a statement may tend to injure Plaintiff in his business or occupation. *See McCall*, 623 S.W.2d at 884. Thus, Plaintiff has made a prima facie showing of defamation.

Alexander claims that this statement is entitled to qualified privilege as it was made within an employment relationship. However, qualified immunity does not apply when the statement is published with malice. *Columbia Sussex*, 627 S.W.2d at 275.

This Court finds that there is an issue of material fact as to whether Alexander published Statement 10 with malice, and therefore this claim is properly resolved by the jury.

D.     Statement Number 12

Statement 12 reads:

29

May-June 2003.  Numerous internal and external complaints regarding problems with the handling of the new head baseball coach search.

Plaintiff admits that there were external complaints regarding problems with the handling of the new head baseball coach.  Plaintiff stated that "as far as [he was] aware of, there [were] no internal complaints . . . If there were they weren't made available to me." Although he indicates that he was not aware of internal complaints, Plaintiff has not shown that this statement was false, and, therefore, this Court finds that Plaintiff's claim that Statement 12 is defamatory fails as a matter of law.  *See Stringer*, 151 S.W.3d at 795-96.

2.      Press Releases

Plaintiff claims that he was defamed by Alexander's release of false information to the press. Specifically, Plaintiff points to a press release written personally by Alexander and released by MSU, which contained statements regarding an NCAA review of the Athletics Department.  On November 19, 2004, the Paducah Sun published an article based on this press release.  Plaintiff claims that the press release contained false and defamatory statements made by Alexander, specifically (1) the NCAA was concerned that there was an overabundance of arrests and other problems that demanded serious and immediate attention; and (2) that NCAA officials said that MSU's athletic program would likely end up in significant trouble with the NCAA in a couple of years if changes were not made.  Plaintiff also points to an email forwarded by Alexander on September 21, 2004, to Bill Bartleman with the Paducah Sun.  In this email, Alexander stated that "athletic revenues and attendance continue to decline in the major sports."

A.      November 18, 2004, Press Release

On November 18, 2004, Alexander sent an email to Sherry McClain, MSU News Bureau Manager, which became the basis of a Paducah Sun article released on November 19, 2004.

Plaintiff claims that the press release contained false and defamatory statements made by Alexander.

Plaintiff claims that the NCAA officials never made statements that they were concerned that there was an overabundance of arrests and other problems demanding serious and immediate attention. The NCAA officials who visited MSU testified that they never made this statement. Stratten recalls telling Alexander that there were serious problems but does not recall telling him that they needed immediate attention. Stallmen indicates that she found that there needed to be better communication between athletics and the administrative side of MSU but that she never stated that MSU's arrest record was extremely high.

Plaintiff also claims that the NCAA officials never stated that MSU's athletic program would likely end up in significant trouble with the NCAA in a couple of years if changes were not made Stratten indicated that he did not recall making this statement specifically but that he "did allude to the fact that they had issues that I think needed attention." Stratten testified that he stated "over time, if you don't turn this tide, you're going to see significant problems." Stratten's concerns were based on Title IX compliance and the breakdown between the athletic program and admissions.

Alexander has failed to demonstrate the veracity of the statements at issue. Drawing all reasonable inferences against Alexander, Plaintiff has demonstrated that Alexander acted with malice as he knew or should have known that these statements which he attributed to the NCAA representatives were false. The statement is also defamatory as it refers to problems with the department which Plaintiff administered and might tend to injure Plaintiff in his business or occupation. *See McCall*, 623 S.W.2d at 884. As there is a jury issue as to whether the statement was published with malice, this Court cannot find that a claim of qualified privilege would apply. *See Columbia Sussex*, 627 S.W.2d at 275.

This Court finds that there is an issue of material fact as to whether Alexander published the statements leading to the November 18, 2004, press release with malice, and therefore this claim is properly resolved by the jury.

B.      Email to Bill Bartleman

Plaintiff claims that he was defamed by Alexander when Alexander forwarded an email on September 21, 2004, to Bill Bartleman with the Paducah Sun, stating that "athletic revenues and attendance continue to decline in the major sports."

As discussed above, MSU football home attendance decreased in the period between 1998 and 2003. Although men's football attendance decreased, there has been no showing that the overall attendance at major sports declined and basketball attendance actually increased. Nor has there been any showing that revenues for major sports as a whole declined. Therefore, there are material issues of fact as to the veracity of this statement. However, Alexander is entitled to summary judgment on the defamation claim in regards to this statement as Plaintiff has made no showing that the statement was made with actual malice. Plaintiff did not show that Alexander knew or should have known that athletic revenues and attendance continued to decline in the major sports. Although, he points to evidence indicating an increase in revenue for the sport of men's basketball, he does not point to evidence demonstrating an increase in athletic revenues for *all* major sports. Additionally, he does not demonstrate that attendance did not decline in *all* major sports and there was actually evidence indicating that attendance at the major sport of football had declined.

Therefore, this Court finds that Plaintiff's claim that this email was defamatory fails as a matter of law as Plaintiff has not demonstrated that Alexander made this statement with actual malice.

32

In summary, this Court finds that Plaintiff may proceed on his claim of defamation with regards to Statement 10 of the "Statement of Particulars" and the November 18, 2004, press release. Plaintiff has failed to state a claim of defamation with regards to the other statements at issue.

## IV.    INTERFERENCE WITH CONTRACTUAL RELATIONS

Plaintiff alleges that Alexander improperly interfered with his contractual relations based upon his transfer from the position of AD.  Kentucky follows the guidelines of § 766 of the RESTATEMENT (SECOND) OF TORTS (1965) for the tort of interference with contractual relations. *Carmichael-Lynch-Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977).

§ 766 of the RESTATEMENT (SECOND) OF TORTS states:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

In essence, to recover under this theory, Plaintiff must prove (1) the existence of a contract; (2) Defendant's knowledge of this contract; (3) Defendant intended to cause its breach; (4) Defendant's conduct caused the breach; (5) this breach resulted in damages to Plaintiff; and (6) Defendant had no privilege or justification to excuse its conduct.  *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995).  Thus, in order to state a cause of action for interference with contractual relations, Plaintiff must show that MSU breached its contract with Plaintiff.

As Plaintiff has failed to state a cause of action for breach of contract, his cause of action for intentional interference with contractual relations also fails as a matter of law.

## V.    INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

Plaintiff testified that he sought employment as AD with Eastern Kentucky University by forwarding his application during a time when Eastern Kentucky University was hiring for that position.  Plaintiff claims that Alexander intentionally interfered with his prospective contractual relations when he discussed the MSU Athletics Department problems with the President of Eastern Kentucky University during the time that Eastern Kentucky University was looking for an AD and after Plaintiff had applied for that position.[8]

In *National College Athletic Ass'n v. Hornung*, the Kentucky Supreme Court adopted the tort of tortious interference with prospective contractual relations from sections 766B, 767, and 773 of the RESTATEMENT (SECOND) OF TORTS. *Nat'l Coll. Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky.1988).  Section 766B provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

RESTATEMENT (SECOND) OF TORTS § 766B.

Plaintiff has alleged that he sought employment with Eastern Kentucky University by forwarding his application during a time when Eastern Kentucky University was hiring for the position of AD.  Thus, Plaintiff has demonstrated the existence of a prospective contractual relationship.  *See* RESTATEMENT (SECOND) OF TORTS § 766B cmt. c (stating that interferences with

---

[8] Alexander testified that he was told that Eastern Kentucky University was looking for an AD but that he was not aware that Plaintiff was interested in the position.

the prospect of obtaining employment are included within the types of relations protected against intentional interference by the rule stated in § 766B).

Alexander contends that Plaintiff has failed to present evidence that any entity failed to enter into a contractual relationship with him as a result of any actions taken by Alexander.  However, Alexander did testify that his discussion at a conference of the Athletics situation with the President of Eastern Kentucky University could possibly affect Plaintiff's ability to get a job at Eastern Kentucky University.  This Court finds that Plaintiff has presented sufficient, if scant, evidence on causation.

"[A] party may not recover under [this tort] in the absence of proof that the opposing party 'improperly' interfered with his prospective contractual relation.  *Hornung*, 754 S.W.2d at 858.  To determine whether an actor's interference is improper, Kentucky courts examine several factors:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

RESTATEMENT (SECOND) OF TORTS § 767; *see E. Ky. Res. v. Arnett*, 892 S.W.2d 617, 619 (Ky. Ct. App. 1995).  Of these factors, the motive and the means have been considered the most important.  *See Hornung,* 754 S.W.2d at 859.  Turning to motive, a defendant's malice can be inferred when the defendant lacks proof of a justification for its action.  *Id*.  If the defendant has a "legitimate interest

to protect," the defendant may have a motive of spite and still not be liable.  *Id.*

Plaintiff has failed to show that Alexander improperly interfered with Plaintiff's prospective contractual relation.  Alexander's conversation with the President of Eastern Kentucky University occurred at a conference where the parties were discussing issues concerning their universities.  Also included in this conversation was the President of Morehead State University.  As Athletics plays no small part in a university, it was reasonable for these presidents to discuss the problems facing this department together.  It is natural that such a conversation would include the particular problems facing each university.  As Alexander had a legitimate interest in conducting this conversation, he can not be held liable.  *See id.*

Therefore, this Court finds that Plaintiff's action for interference with prospective contractual relations fails as a matter of law.

## VI.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/OUTRAGE

Plaintiff's intentional infliction of emotional distress/outrage claim is based upon Alexander's defamatory and interfering actions and Alexander's invasion or directed invasion of Plaintiff's privacy by gaining access to Plaintiff's personal computer files and removing from Plaintiff's office personal notes and effects.

To make out a claim for intentional infliction of emotional distress, or outrage, the plaintiff must show that: (1) defendants' conduct was intentional or reckless; (2) the conduct was outrageous and intolerable in that it offends against generally accepted standards of decency and morality; (3) a causal connection between defendants' conduct and the emotional distress; and (4) the emotional distress is severe.  *Gilbert v. Barkes*, 987 S.W.2d 772, 777 (Ky. 1999).  An action for intentional infliction of emotional distress will not lie for "petty insults, unkind words and minor indignities;

the action only lies for conduct which is truly outrageous and intolerable." *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky Ct.. App. 2001). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Stringer*, 151 S.W.3d at 789 (quoting Restatement (Second) of Torts § 46(1) cmt. d).

Kentucky courts have found plaintiffs' proof of outrageous conduct sufficient to support an intentional infliction of emotional distress claim in cases where the defendants:

> (1) harassed the plaintiff "by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic"; (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; (3) engaged in "a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring [plaintiff] to his knees"; (4) committed same-sex sexual harassment in the form of "frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex"; (5) was a Catholic priest who "used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife"; (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter; and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.

*Stringer*, 151 S.W.3d at 789-90 (citations and footnotes omitted); *cf. Bednarek v. United Food & Commercial Workers Int'l Union*, 780 S.W.2d 630, 632 (Ky. Ct. App. 1989) (defendants entitled to summary judgment on plaintiff's claim of intentional infliction of emotional distress where plaintiff alleged employer wrongfully discharged her in retaliation for filing a workers' compensation claim).

In the instant case, this Court finds that the average community member would not be outraged by the transfer of Plaintiff from the position of AD to DCFG with no loss of salary or benefits. This Court also finds that any invasion by or directed by Alexander of Plaintiff's privacy

by gaining access to Plaintiff's personal computer files and removing from Plaintiff's office personal notes and effects is not so truly outrageous or intolerable as to rise to the level of conduct required for a claim of intentional infliction of emotional distress.  Finally, this Court finds that any remarks made by the Defendants concerning the Plaintiff were not so outrageous as to offend generally accepted standards of decency and morality.

Therefore, this Court finds that Plaintiff's action for intentional infliction of emotional distress fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

An appropriate order shall issue.